United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Marisa Tarrau, Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 24-24397-Civ-Scola |
| | ) |
| Club Demonstration Services Inc., | ) |
| Defendant. | |

### Order Granting Motion to Compel Arbitration

This matter comes before the Court on the Defendant Club Demonstration Services, Inc.'s motion to compel arbitration. (Mot., ECF No. 14.) The Plaintiff Marisa Tarrau responded opposing the motion (Resp., ECF No. 18), and the Defendant replied. (Reply, ECF No. 27). Having considered the parties' briefings, the record, and the relevant legal authorities, the Court **denies without prejudice** the Defendant's motion. (**ECF No. 14**.)

**1. Background**

Plaintiff Marisa Tarrau seeks relief under the Americans with Disabilities Act, the Age Discrimination in Employment Act, and the Florida Civil Rights Act after Club Demonstration Services ("CDS") allegedly discriminated against Tarrau on the basis of her disability/handicap. (Notice of Removal, Compl., ECF No. 1-2, at 7.) In response, CDS has moved to compel arbitration and stay this case. (Def.'s Mot., ECF No. 14.) In support CDS cites various agreements between the parties, including two purported arbitration agreements. (Exs. 2 & 4 ¶ 1, ECF No. 14-1.)

**2. Legal Standard**

The Eleventh Circuit treats a motion to compel arbitration as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *Tracfone Wireless, Inc. v. Simply Wireless, Inc.*, 229 F. Supp. 3d 1284, 1292 (S.D. Fla. 2017) (Moreno, J.) (cleaned up). Accordingly, in ruling on a motion to compel arbitration, the Court may consider matters outside of the four corners of the complaint. *Id.* (cleaned up).

"Federal law establishes the enforceability of arbitration agreements, while state law governs the interpretation and formation of arbitration agreements." *Employers Ins. of Wausau v. Bright Metal Specialties, Inc.*, 251 F.3d 1316, 1322 (11th Cir. 2001) (cleaned up). Whether an arbitration

agreement exists is "simply a matter of contract." *Bazemore v. Jefferson Cap. Sys.*, LLC, 827 F.3d 1325, 1329 (11th Cir. 2016) (cleaned up). The Federal Arbitration Act ("FAA") creates a presumption of arbitrability, but that presumption does not apply to disputes over whether an agreement to arbitrate exists. *Id.*

Courts employ a summary judgment standard on motions to compel arbitration and may conclude parties did or did not enter into an arbitration agreement as a matter of law only if "there is no genuine dispute as to any material fact" concerning the formation of such an agreement. *Id.* at 1333 (cleaned up).

### 3. Analysis

For the reasons noted below, there is a genuine issue as to whether the parties had an enforceable arbitration agreement. Therefore, the issue of arbitrability must proceed to trial.

### A. Whether the Arbitration Agreement is Enforceable

In opposing the motion to compel arbitration, Tarrau does not challenge the *scope* of the arbitration clauses.[1] Rather, "she disagrees that she signed the agreements, or that she was even aware of the agreements, and thus refuses to arbitrate any claims." (Pl.'s Resp., at 5.) Because the scope of the arbitration agreements is not at issue, the Court excerpts them only in part below:

> **Arbitration Agreement Acknowledgement**
>
> **MUTUAL AGREEMENT TO ARBITRATE CLAIMS**
>
> It is not uncommon for disputes to arise between an employer and an employee. Arbitration is a speedy, impartial and cost-effective way to resolve these disputes. For this reason, except as otherwise provided in this Mutual Agreement to Arbitrate Claims ("Agreement"), you and Advantage Sales & Marketing LLC (hereinafter, the "Company") agree to resolve in binding arbitration all claims or controversies ("Claims") that the Company may have against you, or that you (and no other party) may have against any of the following: (1) the Company, (2) its officers, directors, employees or agents in their capacity as such or otherwise, (3) the Company's parents, subsidiaries and affiliated entities, including but not limited to Daymon Worldwide Inc., its officers, directors, employees or agents and its parents, subsidiaries and affiliated entities (hereinafter, "Affiliated Entities"), (4) the Company's and its Affiliated Entities' benefit plans or the plans' sponsors, fiduciaries, administrators, affiliates and agents, (5) all clients and/or customers of the Company for any claims arising from or relating in any way to your employment with the Company or service in any capacity to any such client or customer, and (6) all successors and assigns of any of them.

---

[1] At one point in her response, Tarrau states that "the Arbitration Agreement Acknowledgment contains no evidence on its face that it is, in any way, related to Defendant Club Demonstration Services Inc." (Pl.'s Resp., at 2.) However, Tarrau neither expands on this argument nor relies on it when opposing the motion.

Ex. 2, ECF No. 14-1.

> 1. **Arbitration**. This Agreement is governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.). Except as it otherwise provides, this Agreement applies to any dispute arising out of or related to your employment with the Company* or relationship with any of its or their agents, employees, affiliates, successors, subsidiaries, assigns or parent companies or termination of employment regardless of its date of accrual and survives after the employment relationship terminates. Covered employment disputes also include, but are not limited to, any claims against the Company's clients, customers or business partners arising out of your or the Company's performance of services on or away from the Company's clients', customers' or business partners' property. Except as it otherwise provides, this Agreement is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before a forum other than arbitration. Except as otherwise stated in this Agreement, you and the Company agree that any legal dispute or controversy covered by this Agreement, or arising out of, relating to or concerning the validity, enforceability or breach of this Agreement, shall be resolved by final and binding arbitration in accordance with the JAMS Employment Arbitration Rules & Procedures ("JAMS Rules") then in effect, and not by court or jury trial, to be held (unless the parties agree in writing otherwise) within 45 miles of and in the same state where you are or were last employed by the Company. The JAMS Rules may be found at www.jamsadr.com or by searching for "JAMS Employment Arbitration Rules" using a service such as www.google.com or by asking the Company's HR Department (9555 Chesapeake Drive, Suite 100, San Diego, CA 92123; AccessHR@daymon.com (email); (800) 573-8861 (phone)) for a copy of the rules. If, for any reason, JAMS will not administer the arbitration, either party may apply to a court of competent jurisdiction with authority over the location where the arbitration will be conducted for appointment of a neutral Arbitrator.

(Ex. 4, ECF No. 14-1.)

Because Tarrau and CDS's employment relationship was based in Florida and the arbitration agreements were allegedly "signed and executed in Florida, Florida law governs whether valid arbitration agreements exist between the parties." *Rodero v. Signal Fin. Co. LLC*, 365 F.Supp.3d 1263, 1266 (S.D. Fla. 2018) (Altonaga, J.) (citations omitted). "In Florida, a meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract. A valid contract requires offer, acceptance, consideration and sufficient specification of essential terms." *Id.* (citations omitted). A signature on an arbitration agreement is not dispositive of whether a meeting of the minds took place if there is evidence that a signature is not the party's or there is other evidence that a party did not agree to the substance of the contract. *See id.* (denying a motion to compel arbitration after finding a genuine dispute of material fact regarding whether purported signature was the plaintiff's).

Here, the first arbitration agreement allegedly contains Tarrau's electronic signature, from July 17, 2020 at 6:46 P.M.:

> **KNOWING AGREEMENT** By signing below, I acknowledge that I have received, read and understand the Mutual Agreement to Arbitrate Claims.
>
> ☑ **E-SIGNATURE STATEMENT**
>
> I agree, and it is my intent, to sign this document, Mutual Agreement to Arbitrate Claims by checking the "I agree" box below and by clicking on the "E-Signature" below and by electronically submitting this document to Advantage Sales & Marketing LLC dba Advantage Solutions, I understand that my signing and submitting this document in this fashion is the legal equivalent of having placed my handwritten signature on the submitted document. Marisa Tarrau 7/17/2020 6:46 PM
>
> ☑ **I Agree**
> (checking the checkbox above is equivalent to a handwritten signature) Marisa Tarrau 7/17/2020 6:46 PM

(Ex. 2, ECF No. 14-1.) There is thus evidence that the parties did, in fact, enter into a valid arbitration agreement.[2] *See Sierra Equity Grp. v. White Oak Equity Partners, LLC*, 650 F. Supp. 2d 1213, 1228 (S.D. Fla. 2009) (Marra, J.) (noting how "[t]he object of a signature is to show mutuality or assent" (citation omitted)); *see also* Fla. Stat. § 668.004 ("Unless otherwise provided by law, an electronic signature may be used to sign a writing and shall have the same force and effect as a written signature.").

Despite this evidence of an enforceable arbitration agreement, Tarrau submits a declaration in which she "unequivocally state[s] that I did not agree to these documents and did not sign these documents, electronically or otherwise." (Tarrau Decl., ECF No. 18-1 ¶ 3.) She adds that she "ha[s] never seen the Arbitration Agreement Acknowledgment and the Arbitration Agreement before." (*Id.*) Tarrau explains that she is "82 years old," that her first language is Spanish, and her "ability to speak and read English [is] limited." (*Id.* ¶ 7.) Moreover, when she was signing onboarding documents on CDS's secure electronic platform ('ICIMS"), Tarrau explains that "assistance was given by managers/supervisors of CDS by taking over the onsite computer and asking me questions verbally in Spanish. I responded to the questions verbally in Spanish. After my responses, I observed the manager/supervisor making entries into the computer." (*Id.* ¶ 10.) Tarrau claims that "[a]t no point did any of the managers/supervisors mention arbitration. I was not made aware that I was agreeing to arbitration." (*Id.* ¶ 12.)

Through her sworn statement, Tarrau "establish[es] a genuine issue of material fact as to the validity of the Arbitration Agreements" because her statement supports the conclusion that there was not a meeting of the minds

---

[2] The second arbitration agreement, however, does not contain a handwritten or electronic signature.

and thus no valid agreement to arbitrate. *Rodero*, 365 F. Supp. 3d at 1265; *see also Bazemore v. Jefferson Capital Sys., LLC.*, 827 F.3d 1325, 1334 (11th Cir. 2016 (noting how the plaintiff did not provide evidentiary support that she had not entered into the arbitration agreement where she did "not, for example, submit[] an affidavit swearing under oath that she" did not receive the arbitration agreement). Therefore, the Court cannot grant the motion to compel arbitration.

At this stage of the case, CDS's arguments are unavailing to preclude a trial on the issue of arbitrability. First, the Court disagrees that Tarrau's affidavit is conclusory. Tarrau does not just say that she did not sign the arbitration agreements; rather, she explains that her knowledge of English is limited, she required assistance from others to translate the computerized documents, and that no one informed her that she was signing an arbitration agreement. (*See generally* Tarrau Decl.) CDS may question her on the credibility of her statements in the affidavit (after all, it was in English and there was not a certified translation of the document), but that is for the trier of fact to decide. Therefore, cases such as *Chastain Robinson-Humphrey Co.*, 957 F.2d 851 (11th Cir. 1992), cited by CDS, do not merit the opposite conclusion.

Second, CDS's reliance on cases approving the use of the ICIMS platform misses the mark. (*See* Def.'s Reply, at 3-6.) The Court is not questioning the validity of the documents merely because they were signed using the ICIMS platform. Rather, the issue for trial is whether Tarrau knew what she was signing—regardless of the platform used—and therefore whether there was a meeting of the minds sufficient to make the arbitration agreement enforceable. For this reason, the Court disagrees that "[Tarrau's] proficiencies are irrelevant at best since a party's language limitations does not preclude compelling arbitration as a matter of law." (*Id.* at 7.) CDS's cases purportedly in support of this proposition only speak to a signor's responsibility to read a contract him or herself; they do not involve a situation, like here, in which it is alleged that the signor reasonably relied on the party enforcing the contract to translate the documents, but the party did not do so accurately or fully. *See Hansen v. Wheaton Van Lines, Inc.*, 486 F. Supp. 2d 1339, 1346 (S.D. 2006) (Ryskamp, J.); *White v. Conduent Commercial Sols., LLC*, Case No.: 1:23-cv-00113 JLT CDB, 2024 WL 4373851, at *9 (E.D. Cal. Oct. 2, 2024); *Soni v. Solera Holdings, Inc.*, Civil Action No. 3:20-cv-02925-M, 2021 WL 1726891, at *4 (N.D. Tex. March 23, 2021).[3]

---

[3] Similarly, CDS argues that "whether or not [Tarrau] physically signed the Arbitration Agreement does not preclude its enforcement because it is undisputed Plaintiff accepted employment with CDS thereafter on two separate occasions, thereby operating as her

Third, CDS notes that its first arbitration agreement "was presented in English and Spanish." (Def.'s Reply, at 7 (citing ECF No. 14-1, Ex. 4.).) However, the that exhibit does not contain Tarrau's signature. Therefore, if CDS wants to rely on this arbitration agreement to compel arbitration, it needs more than the agreement itself to do so.

### B. Whether A Trial Is Necessary to Determine Whether the Court Should Compel Arbitration

There is a genuine dispute as to whether there is an enforceable arbitration agreement between the parties. Under the FAA, "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. "If no jury trial be demanded by the party alleged to be in default . . . the court shall hear and determine such issue." *Id.*

Here, Tarrau demanded a jury trial. (Notice of Removal, Civil Cover Sheet., ECF No. 1-2, at 6.) Therefore, the Court orders that this case proceed to a jury trial on the issue of whether there is an enforceable arbitration agreement amongst the parties. *See Rodero*, 365 F. Supp. 3d at 1266.

Within seven days, the parties are ordered to submit a joint proposed scheduling report on the scope and date of the arbitration trial. The parties should also note whether they agree to a bench trial on the issue of arbitrability.

### 4. Conclusion

CDS's motion to compel arbitration and stay the case is **denied without prejudice**. (**ECF No. 14**.)

**Done and ordered** at Miami, Florida on February 27, 2025.

_____
Robert N. Scola, Jr.
United States District Judge

---

assent to be bound by the Arbitration Agreement." (Def.'s Reply, at 7 (internal citations omitted).) But this argument goes too far—if performance of a job sufficed to assent to an arbitration agreement, would there ever be any need to deny a motion to compel arbitration?—and presupposes that Tarrau was, in fact, aware of the agreement. As the Court has stated, it is disputed whether Tarrau was aware of the arbitration agreement.